2006 ME 99

**Lisa A. GRENIER**

v.

**Gary P. GRENIER.**

Supreme Judicial Court of Maine.

Argued: May 9, 2006.

Decided: Aug. 16, 2006.

---

Sarah C. Mitchell, Esq. (orally), Skelton, Taintor & Abbott, P.A., Auburn, for plaintiff.

Robert L. Guillory, Esq. (orally), Shankman & Associates, Lewiston, for defendant.

Panel: SAUFLEY, C.J., and DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.

DANA, J.

[¶ 1] Lisa A. Grenier appeals from a divorce judgment entered in the District Court (Lewiston, *Cote, J.*), contending that the court erred in failing to carry out an oral agreement she had with her husband, Gary P. Grenier, concerning the distribution of their marital assets and debts; and the court exceeded the bounds of its discretion in its distribution of marital property and its order concerning their two minor children. We disagree and affirm the judgment.

## I. BACKGROUND

[¶ 2] Lisa and Gary were married in 1992 and have two children, ages ten and eight. Before the birth of their first child, they purchased a home near the Auburn airport and lived there together until March 2004, when Gary rented an apartment in Lewiston.

[¶ 3] When they decided to proceed with a divorce, Lisa and Gary reached an oral agreement concerning the disposition of their assets and debts.[1] At the time of the

---

1. Gary contends that the agreement also con-    tained conditions relating to the residency of

agreement, they valued the marital house at $139,500, and the mortgage balance was $91,000. They agreed that Lisa would get the house and pay Gary his share of the equity, reduced by one-half of the disparity in their retirement accounts.[2] This amount they determined to be $20,766. They planned to accomplish this by refinancing the mortgage and by removing Gary's name from both the mortgage and the deed. In April 2004, Lisa paid Gary $20,766 with funds they obtained from refinancing the mortgage. When they refinanced the mortgage, she and Gary went to the bank together to complete the required paperwork. What neither party realized until later was that Gary was not removed from the deed or the mortgage during the refinancing. As a result of the refinancing, the mortgage on the house was increased to about $111,000.

[¶ 4] Lisa and Gary also agreed that of their $30,000 in credit card debt, Lisa would be responsible for one-third of it, and Gary would be responsible for the other two-thirds. To pay for his share of the debt, Gary used most of the check representing his share of the equity in the house. To pay for her share of the credit card debt, Lisa also tapped into her share of the equity in the house by obtaining a home equity loan in the amount of $15,000. With these funds, she paid Gary her share of the credit card debt and used the balance to pay her attorney. As a result of the mortgage refinancing and Lisa's home equity loan, the debt against the house totaled about $126,000. After Gary moved out, Lisa made all of the payments on the mortgage and on her home equity loan.

[¶ 5] Lisa and Gary also worked out a schedule for child sharing. The schedule was broken up into three blocks of time: (1) Monday—Tuesday; (2) Wednesday—Thursday; and (3) Friday—Sunday. Lisa and Gary alternated these blocks of time with the children; i.e., Lisa would have the children Monday—Tuesday, Gary would have them Wednesday—Thursday, Lisa would have them Friday—Sunday, Gary would have them the next Monday—Tuesday, and so on.

[¶ 6] During the fall and winter of 2004, Lisa and Gary's post-separation relationship deteriorated. They were each in new relationships, and Lisa told Gary that she was considering moving, with the children, to Falmouth to live with her boyfriend. Lisa wanted the children to live primarily with her in Falmouth, and Gary wanted to continue their alternating arrangement. The parties were unable to resolve their disagreement, with Gary claiming that their oral property agreement was conditioned upon a continuation of the child sharing arrangement.

[¶ 7] After a hearing on the divorce in May 2005, the court determined that Lisa and Gary's oral agreement was not enforceable because (1) there was no writing as required by the statute of frauds; (2) the oral agreement was conditioned upon Lisa remaining in the marital home and sharing residence of the children with Gary; and (3) the bank was not willing to release Gary from the mortgage. The court ordered that Gary be allowed to move into the marital home in Auburn if Lisa moved to Falmouth, and that whoever was living in the Auburn home would be responsible for the mortgage while living there. The court ordered Lisa to remain solely responsible for payments on her home equity loan. The court awarded

the children.

2. Lisa had a pension valued at about $5000, and Gary had a 401K valued at about

$15,000. They agreed that each would keep their own retirement account.

each party their own retirement accounts, set aside the first $14,000 of the net proceeds from any future sale of the marital home to Lisa, and ordered Lisa and Gary to split equally any remaining net proceeds.[3]

[¶ 8] As to the residency of the children, the court ordered that Lisa and Gary continue to share residency of the children by exchanging the children every few days, even if Lisa relocates to Falmouth. The children are to attend Auburn schools so long as either Lisa or Gary resides in the Auburn home.

## II. THE ORAL AGREEMENT

[¶ 9] Lisa contends that the court erred by finding that the agreement was unenforceable because it was not in writing. She contends that because she substantially complied with the agreement, the part performance doctrine applies and creates an exception to the writing requirement of the statute of frauds. Lisa, however, does not challenge the court's third basis for its decision: that performance of the agreement was impossible.[4] Because the court had a valid, independent, unchallenged basis for concluding the agreement was unenforceable, we do not reach Lisa's statute of frauds challenge. *See Holland v. Sebunya*, 2000 ME 160, ¶ 9 n. 6, 759 A.2d 205, 209 (holding that issues not briefed to this Court generally will not be considered on appeal).

## III. DISTRIBUTION OF MARITAL PROPERTY

[¶ 10] Lisa contends that the court exceeded the bounds of its discretion in its allocation of the marital property.

We review the ... court's disposition of marital property for an abuse of discretion and will overturn its decision only if there is a violation of some positive rule of law or if the division results in a plain and unmistakable injustice, so apparent that it is instantly visible without argument.

*Libby v. Libby*, 2001 ME 130, ¶ 6, 781 A.2d 773, 775 (quotation marks omitted). "A ... court is not required to divide marital property equally, but rather, is required to make the division fair and just considering all of the circumstances of the parties." *Dargie v. Dargie*, 2001 ME 127, ¶ 5, 778 A.2d 353, 355–56 (quotation marks omitted); *see also* 19–A M.R.S. § 953(1) (2005).

[¶ 11] Here, although the court concluded that the parties' oral agreement was unenforceable, the court attempted to distribute the property in a manner that would substantially honor the expectations of the parties. The court did this by awarding to Lisa the first $14,000 of the net proceeds from any future sale of the marital home.

[¶ 12] At the time of their oral agreement, the parties valued the house at $139,500. Of the $48,500 equity in the house, they agreed that Gary would receive $20,766. Lisa would remain in the home and pay the mortgage. Lisa and Gary agreed that Lisa would be responsible for one-third of the credit card debt and Gary would be responsible for the remaining two-thirds. They also agreed to keep their separate retirement accounts. Their financial situation is reflected in the table below:

---

**3.** At the time of the hearing, the home was appraised at $172,000—$32,500 more than the value the parties had assumed the year before.

**4.** Lisa and Gary both assumed, at the time of their oral agreement, that they could obtain the release of Gary from the mortgage. The court's finding that the bank was unwilling to release Gary from the mortgage is supported by the record.

**Financials—Per Agreement**

| Asset/Liability | Value | Lisa | Gary |
|---|---|---|---|
| Home | $139,500 | X | X |
| Mortgage | − 91,000 | X | X |
| Equity in home | 48,500 | 27,734 | 20,766 |
| Lisa's pension | 5,000 | 5,000 | |
| Gary's 401K | 15,000 | | 15,000 |
| Credit card debt | − 30,000 | − 10,000 | − 20,000 |
| Total equity | $ 38,500 | $ 22,734 | $ 15,766 |

[¶ 13] To pay Gary his share of the equity, they refinanced the mortgage, increasing it by $20,000. After doing so, the parties' financial situation looked like this:

**Financials—After Mortgage**

| Asset/Liability | Value | Lisa | Gary |
|---|---|---|---|
| Home | $ 139,500 | X | X |
| Mortgage | − 111,000 | X | X |
| Equity in home | 28,500 | 28,500 | |
| Gary's cash from ref. | 20,766 | | 20,766 |
| Lisa's pension | 5,000 | 5,000 | |
| Gary's 401K | 15,000 | | 15,000 |
| Credit card debt | − 30,000 | − 10,000 | − 20,000 |
| Total equity | $ 39,266 | $ 23,500 | $ 15,766 |

[¶ 14] Lisa and Gary then paid off their credit card debt. Gary used most of the money he received from the refinancing to pay his two-thirds of the credit card debt. Lisa also used her equity in the house to pay her share of the credit card debt by taking out a home equity loan. She used an additional $5000 from her home equity loan to pay for her counsel. With the credit card debt paid off, the parties' financial arrangement is reflected below.

**Financials—After Paying Credit Card Debt**

| Asset/Liability | Value | Lisa | Gary |
|---|---|---|---|
| Home | $ 139,500 | X | X |
| Mortgage | − 111,000 | X | X |
| Home equity loan | − 15,000 | X | |
| Equity in home | 13,500 | 13,500 | |
| Credit card debt | 0 | 0 | |
| Lisa's pension | 5,000 | 5,000 | |
| Gary's 401K | 15,000 | | 15,000 |
| Total equity | $ 33,500 | $18,500 5 | $15,000 |

5. The reduction in Lisa's total assets from $23,500 in the previous table to $18,500 in this table reflects the fact that she borrowed $5000 to pay her counsel. The record does not reflect whether or what Gary paid his counsel.

6. Reflecting appraisal in May 2005.

[¶ 15] Had the agreement been consummated and had Lisa sold the house for the anticipated amount, after paying off the mortgage and her home equity loan, she would have received $13,500 in net proceeds. To reflect this expectancy, the court awarded her the first $14,000 of the net proceeds from any future sale of the home.

[¶ 16] The court ordered the property to be distributed as follows:

**Financials—After Court Judgment**

| Asset/Liability | Value | Lisa | | Gary |
|---|---|---|---|---|
| Home | $ 172,000 6 | X | or | X |
| Mortgage | − 111,000 | X | or | X |
| Home equity loan | − 15,000 | X | | |
| Equity in home | 46,000 | 30,000 | | 16,000 |
| Lisa's pension | 5,000 | 5,000 | | |
| Gary's 401K | 15,000 | | | 15,000 |
| Total equity | $ 66,000 | $35,000 | | $31,000 |

[¶ 17] The court did not abuse its discretion in requiring that Lisa be responsible for the home equity loan because the loan represented her share of the credit card debt and her attorney fees. Nor did the court abuse its discretion in requiring Lisa to be responsible for the mortgage as long as she lives in the house. Since Gary remained liable on the mortgage, the court also did not abuse its discretion in awarding him one-half of any appreciation over $139,500, recognizing that he would be liable for one-half of any depreciation. The court did not exceed the bounds of its discretion in distributing the parties' marital property.

## IV. SHARED RESIDENCY OF THE CHILDREN

[¶ 18] The court ordered that Lisa and Gary continue their child sharing arrangement and that the children remain in

the Auburn school system regardless of where Lisa chooses to reside. If she chooses to move to Falmouth, the court order permits Gary to move into the Auburn home so the children may remain in the Auburn schools.

[¶ 19] Lisa asserts that she is the primary care provider for the children and their best interests are not served by ordering them to attend schools one-half an hour away from where she wants to live. She contends that Gary's activities interfere with his availability for parenting. She argues that the court ignored the recommendations of the guardian ad litem and contends that requiring the children to remain in Auburn when she moves to Falmouth promotes uncertainty.

[¶ 20] We review child custody decisions for a clear abuse of discretion or error of law. *Boutin v. Dionne*, 458 A.2d 426, 426 (Me.1983). In making a decision regarding a child's residence, a court must apply the best interests of the child standard. 19–A M.R.S. § 1653(3) (2005).[7] "The court's decision regarding the best interests of the child is entitled to substantial deference and its findings will stand unless clearly erroneous." *Hinkley v. Hinkley*, 2000 ME 64, ¶ 7, 749 A.2d 752, 754. "A finding is clearly erroneous only

if there is no competent evidence in the record to support it." *Zink v. Zink*, 687 A.2d 229, 232 (Me.1996) (quotation marks omitted).

[¶ 21] The court had before it the following evidence: Lisa is employed as a nurse in Lewiston and works three twelve-hour shifts each week. She has designed her work schedule to maximize her time with her children and has considerable flexibility to vary her schedule from week-to-week, including breaking up one of her shifts into two shorter shifts. Gary works full-time as an information technology manager in Lewiston. He also plays in a band, which practices one night per week and often performs on the weekends. Although Gary testified that the band's events could be scheduled around the children, the band had previously scheduled a few performances on weekends when he had the children. On those occasions, Gary left the children with his parents or his sister. Gary also plays in a hockey league every Sunday night from September through March, and he works out at the gym three mornings per week.

[¶ 22] Both Lisa and Gary have played major roles in parenting the children and both are capable of caring for them. The children's maternal and paternal grandpar-

---

7. Title 19–A M.R.S. § 1653(3) (2005) provides:

The court, in making an award of parental rights and responsibilities with respect to a child, shall apply the standard of the best interest of the child. In making decisions regarding the child's residence and parent-child contact, the court shall consider as primary the safety and well-being of the child. In applying this standard, the court shall consider[, among others,] the following factors:

A. The age of the child;
B. The relationship of the child with the child's parents and any other persons who may significantly affect the child's welfare;

....

D. The duration and adequacy of the child's current living arrangements and the desirability of maintaining continuity;
E. The stability of any proposed living arrangements for the child;

.... 

G. The child's adjustment to the child's present home, school and community;
H. The capacity of each parent to allow and encourage frequent and continuing contact between the child and the other parent, including physical access;

....

ents live in the Lewiston–Auburn area, have close and supportive relationships with their grandchildren, and often take them for overnights. At the time of the hearing, the children were in the first and third grades in the Auburn school system and had been with the same daycare provider for four years.

[¶ 23] The court found that remaining in the Auburn home is ideal for the children, the children share a strong bond with both sets of grandparents, and Lisa has flexibility in her schedule and is available for the children more than Gary is during the day. The court acknowledged Gary's commitments to his personal activities, but determined that it was more important to the children's stability to remain in the home they have been in since birth, in the community in which they have been raised, and in the school and daycare they have been attending. We cannot say that these findings are clearly erroneous. Contrary to Lisa's contentions, the court properly considered the best interests of the children, *see* 19–A M.R.S. § 1653(3), and gave significant weight to the following factors: the duration and adequacy of the children's current living arrangements; the desirability of maintaining continuity; the stability of the proposed living arrangements for the children; and the children's adjustment to their present home, school, and community, *see* 19–A M.R.S. § 1653(3)(D), (E), (G). The court did not exceed the bounds of its discretion in determining the best interests of the children.

The entry is:

Judgment affirmed.